IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

VERDIE POGUE,
     Plaintiff,

vs.                     Case No.: 3:16cv81/EMT

NANCY A. BERRYHILL,[1]
Acting Commissioner of Social Security,
     Defendant.
_____/

## MEMORANDUM DECISION AND ORDER

This case has been referred to the undersigned magistrate judge for disposition

pursuant to the authority of 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73, based on the

parties' consent to magistrate judge jurisdiction (*see* ECF Nos. 4, 5). It is now before

the court pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act"), for

review of a final decision of the Commissioner of the Social Security Administration

("Commissioner") denying Plaintiff's application for disability insurance benefits

("DIB") under Title II of the Act, 42 U.S.C. §§ 401–34.

---

[1] Nancy A. Berryhill became the Acting Commissioner of Social Security on January 23, 2017. Pursuant to Fed. R. Civ. P. 25(d), she is therefore automatically substituted for Carolyn W. Colvin as the Defendant in this case.

Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are supported by substantial evidence; thus, the decision of the Commissioner should be affirmed.

I.      PROCEDURAL HISTORY

On October 29, 2012, Plaintiff filed an application for DIB, and in the application he alleged disability beginning May 9, 2012 (tr. 14).[2] His application was denied initially and on reconsideration, and thereafter he requested a hearing before an administrative law judge ("ALJ"). A hearing was held on March 27, 2014, and on June 30, 2014, the ALJ issued a decision in which she found Plaintiff "not disabled" as defined under the Act at any time through the date of her decision (tr. 14–32). The Appeals Council subsequently denied Plaintiff's request for review. Thus, the decision of the ALJ stands as the final decision of the Commissioner, subject to review in this court. Ingram v. Comm'r of Soc. Sec. Admin., 496 F.3d 1253, 1262 (11th Cir. 2007). This appeal followed.

II.     FINDINGS OF THE ALJ

---

[2] All references to "tr." refer to the transcript of Social Security Administration record filed on May 3, 2016 (ECF No. 7). Moreover, the page numbers refer to those found on the lower right-hand corner of each page of the transcript, as opposed to those assigned by the court's electronic docketing system or any other page numbers that may appear.

In denying Plaintiff's claims, the ALJ made the following relevant findings (*see* tr. 14–32):

(a)     Plaintiff met the insured requirements of the Act through December 31, 2016[3];

(b)     Plaintiff had not engaged in substantial gainful activity since May 9, 2012, the alleged onset date;

(c)     Plaintiff had the following severe impairments: lumbar spine spondylosis, dextroscoliosis and facet arthropathy; obesity; left knee pain; benign essential hypertension; and esophageal reflux;

(d)     Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1;

(e)     Plaintiff had the residual functional capacity to perform a range of sedentary work as defined in 20 C.F.R. § 404.1567(a). Plaintiff could lift/carry up to 10 pounds occasionally and stand/walk for approximately two hours per 8-hour workday. He could sit for approximately six hours per 8-hour workday, with normal breaks. Plaintiff would need to alternate between sitting and standing at the work station on an occasional basis. He would be unable to push/pull leg or foot controls. Additionally, Plaintiff should avoid repetitive bending and twisting, and should not bend over completely at the waist. However, he would be capable of leaning forward. Plaintiff should also avoid climbing, crouching, kneeling or crawling. Plaintiff should avoid operating dangerous moving machinery, working at unprotected heights and driving automotive equipment. Due to pain, fatigue and the potential for medicinal side effects, he could be expected to have deficits in concentration, persistence or pace that could cause him to be off-task or unproductive up to 5 percent of the workday;

---

[3] Thus, the time frame relevant to Plaintiff's claim for DIB is May 9, 2012 (date of alleged onset), through December 31, 2016 (date last insured).

(f)     Plaintiff was unable to perform work he previously performed;

(g)     Plaintiff was born on April 27, 1970, and was 42 years old, which was defined as a younger individual aged 18–44 on the alleged disability onset date. Plaintiff subsequently changed age category to a younger individual aged 45–49;

(h)     Plaintiff had at least a high school education and was able to communicate in English;

(i)     Transferability of job skills was not an issue because Plaintiff did not have past relevant work;

(j)     Considering Plaintiff's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that Plaintiff could perform.

(k)     Plaintiff was not under a disability, as defined in the Act, from May 9, 2012, through the date of the decision.

## III.     STANDARD OF REVIEW

Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards.  Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."); see also Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).  "A determination

that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles." Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds as stated in* Elam v. R.R. Ret. Bd., 921 F.2d 1210, 1214 (11th Cir. 1991). As long as proper legal standards were applied, the Commissioner's decision will not be disturbed if in light of the record as a whole the decision appears to be supported by substantial evidence. 42 U.S.C. § 405(g); Falge v. Apfel, 150 F.3d 1320, 1322 (11th Cir. 1998); Lewis, 125 F.3d at 1439; Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995). Substantial evidence is more than a scintilla, but not a preponderance; it is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)); Lewis, 125 F.3d at 1439. The court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted). Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence. Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).

The Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do his previous work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id*. § 423(d)(2)(A). Pursuant to 20 C.F.R. § 404.1520(a)–(g), the Commissioner analyzes a disability claim in five steps:

1. If the claimant is performing substantial gainful activity, he is not disabled.

2. If the claimant is not performing substantial gainful activity, his impairments must be severe before he can be found disabled.

3. If the claimant is not performing substantial gainful activity and he has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if his impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.      If the claimant's impairments do not prevent him from doing his past relevant work, he is not disabled.

5.      Even if the claimant's impairments prevent him from performing his past relevant work, if other work exists in significant numbers in the national economy that accommodates his RFC and vocational factors, he is not disabled.

The claimant bears the burden of establishing a severe impairment that keeps him from performing his past work.  20 C.F.R. § 404.1512.  If the claimant establishes such an impairment, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform.  MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must then prove he cannot perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

IV.    PLAINTIFF'S MEDICAL AND PERSONAL HISTORY

A.      Relevant Medical History[4]

---

[4] As it is Plaintiff's contention that the ALJ improperly discounted the weight or credibility of Plaintiff's testimony regarding his symptoms and limitations, the court focuses primarily but not exclusively on those portions of the record that are cited by Plaintiff.

A precipitating event for much of Plaintiff's disability occurred on January 5, 2012, when Plaintiff, who was working as a high school custodian, injured his back while throwing a trash bag into a receptacle (tr. 261). Plaintiff had not had chronic back problems before the incident (*id*.). Plaintiff was seen by Cindy Behrens, M.D., on January 9, 2012, who diagnosed him with acute low back pain and a hemorrhoid flare for which she prescribed Skelaxin, Naprosyn, and Proctosol HC cream (tr. 262). Dr. Behrens also restricted him to pushing, pulling, and lifting a maximum of ten pounds, and no repetitive bending, stooping, crawling, or kneeling; as the ALJ noted, Dr. Behrens also stated that Plaintiff could return to work with these restrictions (tr. 262). Dr. Behrens saw Plaintiff again on January 16, 2012, and noted some palpable tenderness of Plaintiff's mid back that was aggravated by bending. Dr. Behrens initiated physical therapy (tr. 263). On January 31, 2012, Plaintiff reported his back pain was not much better, rating it at a six on a scale of one to ten, but that he was continuing with his light duty work (tr. 264). An x-ray of Plaintiff's lumbar spine revealed degenerative endplate changes at L2, L3 and L5, and minimal sclerosis of the inferior endplate of L2 (tr. 265). At a February 15, 2012, visit, Plaintiff stated his pain was at an eight out of ten. He had continued his light duty work but stated he was still doing a lot of work requiring use of his back muscles, which caused stiffness. Dr. Behrens told Plaintiff to not work for three days, noting that a period

of rest could help his back. She also ordered an MRI and referred him to physiatry (tr. 266). The MRI, taken on March 12, 2012, showed limited spondylosis and facet arthropathy at L3–L4 and L4–L5, mild mid lumbar dextroscoliosis, and a slight bulged annulus posteriorly at L5–S1 (tr. 268).

Plaintiff also attended physical therapy sessions, beginning in January and ending in March of 2012. Through ten sessions, Plaintiff's progress or improvement was limited due to episodic pain which made tolerating the sessions difficult (tr. 269–80). During the sessions, Plaintiff's pain level would fluctuate from zero to seven out of ten (tr. 278).

Plaintiff was also seen by Dr. Shane VerVoort, a physiatrist, for pain management beginning in April 17, 2012. Plaintiff reported tightening in his back caused by movement. Dr. VerVoort's physical examination found tenderness in the right L4-5 and L5-S1 facet joint regions and occasional, brief spasms with active range of motion at the waist (tr. 437). Plaintiff reported a catching sensation in the right low back area, and Dr. VerVoort noted altered spinal mechanics when Plaintiff arose from a flexed position (*id*.). Dr. VerVoort's impressions were mild multilevel lumbar spondylosis and symptomatic right facet arthropathy, for which he prescribed ibuprofen and Opana IR and restricted his work to lifting no more than ten pounds

and no bending, twisting, or prolonged standing (tr. 438).  On May 3, 2012, Dr. VerVoort changed his prescription to OxyContin because of the "likely chronic nature of his symptoms" (tr. 431).

On May 8, 2012, Dr. VerVoort completed a workers' compensation form on behalf of Plaintiff (tr. 427–30).  Dr. VerVoort recommended that Plaintiff be limited to standing no more than thirty minutes at a time and no more than four hours a day, but in response to the question, "Is the employee unable to perform any of his/her job functions due to the condition," Dr. VerVoort answered "No" (tr. 428).  When asked on the form whether it might be medically necessary for Plaintiff to be absent from work during flare-ups of his condition, Dr. VerVoort responded "possibly," but when asked to estimate the frequency and duration of the flare-ups over the next six months, he responded "impossible to know" (tr. 429).

During a visit with Dr. VerVoort on May 17, 2012, Plaintiff stated that the OxyContin was significantly helping his pain, although he still had pain flare-ups during increased activity or during rainy weather (tr. 417).  Plaintiff reported that he took morphine sulfate about three times a week when he experienced breakthrough pain (tr. 417).  Plaintiff remained restricted to light duty work, which he seemed to be tolerating well (*id*.).  On a June 19, 2012, visit, Plaintiff reported constant aching

in his lower back which forced him to frequently change positions and interfered with his sleep (tr. 414). On a September 5, 2012, visit, Plaintiff informed Dr. VerVoort that his employer would not allow him to return to his custodian job unless he could resume full duty work (tr. 405).

On referral from Dr. VerVoort, Plaintiff began seeing Dr. Aaron Stein, a pain management specialist, on June 22, 2012. Dr. Stein noted Plaintiff's main complaint to be pain in his low back and right leg, made worse by activity and made better with ice and a warm, moist towel as a buffer (tr. 299). Dr. Stein recommended "[d]iagnostic medial branch blocks for treatment of pain related to arthropathy of the posterior elements at Lumbar" (tr. 300). Dr. Stein provided that the injection therapy was "necessary and indicated in order to return the patient to his high level of functionality is [sic] possible and treat the patient's ongoing pain symptoms" (tr. 301). Dr. Stein noted that Plaintiff had tried and failed conservative treatment (*id*.).

Plaintiff received his first injection on June 28, 2012 (tr. 294–95). Dr. Stein noted that Plaintiff had 90 percent relief from his pre-block symptoms (tr. 293). A second injection was performed on July 24, 2012 (tr. 290–92). At his next appointment with Dr. Stein on August 20, 2012, Plaintiff reported 60 percent relief in his lower back pain. He also complained that his left side had begun to hurt; it was

decided that in follow-up with Dr. VerVoort, Plaintiff would decide whether to have injections on his left side (tr. 289).

At a September 5, 2012, appointment with Dr. VerVoort, treatment injections for Plaintiff's left side were approved. Dr. VerVoort noted that Plaintiff's greatest pain came during lumbar extension, and his extension mobility was restricted to ten degrees. There was no leg weakness or numbness, however, and no radiating leg pain (tr. 405). Dr. VerVoort maintained Plaintiff's restriction to light duty work (tr. 405). Subsequently, on September 20, 2012, Plaintiff received an injection at Dr. Stein's office (tr. 282–84).

Dr. VerVoort examined Plaintiff following the injection on September 27, 2012. Plaintiff reported that the injection helped his pain, but he still had pain after twenty minutes of physical activity (tr. 395). Dr. VerVoort also completed an Employee Work Status Form on that day, identifying the following restrictions for Plaintiff: no pushing or pulling over twenty pounds; no work over the shoulder; no repetitive twisting or bending at the waist; no prolonged bent-forward posture; no repetitive or prolonged squatting or stooping; no kneeling, squatting, crawling, or climbing; and no work at unprotected heights (tr. 396). Dr. VerVoort provided that Plaintiff could return to work for eight hours per day under these restrictions (*id.*).

On October 17, 2012, Dr. VerVoort completed a form for Plaintiff's long-term disability insurance carrier. He diagnosed lumbar degenerative disc disease as well as marked obesity and diabetic neuropathy (tr. 391). Dr. VerVoort restricted Plaintiff to lifting no more than ten pounds, no bending, and no standing for more than thirty minutes at a time. Dr. VerVoort again stated that Plaintiff could return to work if accommodations were made for the restrictions he identified (*id.*).

Plaintiff saw Dr. VerVoort on October 23, 2012. Plaintiff reported that the OxyContin kept him awake at night and that he also experienced spasms at night, for which Dr. VerVoort prescribed Flexeril (tr. 388). On November 20, 2012, Plaintiff stated that he was benefitting from the Flexeril (tr. 382). Because of Plaintiff's difficulty sleeping, Dr. VerVoort switched him from OxyContin to Avinzan, which was a once-a-day dose that Plaintiff could take in the morning (*id.*).

On December 3, 2012, Dr. VerVoort completed a questionnaire produced by the workers' compensation carrier (tr. 380–81). In it, he identified Plaintiff's diagnosis as symptomatic lumbar facet arthropathy (tr. 380). Dr. VerVoort stated that Plaintiff's treatment plan consisted of annual lumbar injections and a long acting narcotic for pain. Dr. VerVoort indicated that Plaintiff was capable of light duty, full-time work, with no lifting over ten pounds and no bending at the waist (*id.*).

On a follow-up visit on December 13, 2012, Plaintiff reported good results with the initiation of Avinza (tr. 377). Plaintiff remained restricted to light duty (*id*.). On January 15, 2013, Plaintiff reported to Dr. VerVoort that the Avinza was helping with his pain but that he was taking his morphine sulfate for breakthrough pain two or three times per day (tr. 370). During the visit, Plaintiff was able to demonstrate full active forward flexion at the waist, but he had a pinching, low back pain when he arose or bent backward (*id*.). Dr. VerVoort concluded that Plaintiff had reached maximum medical improvement and assigned him a five percent whole person impairment rating based on Florida Guidelines. Dr. VerVoort found Plaintiff "clearly" to be capable of light duty work but with no repetitive bending or twisting at the waist, no lifting over twenty pounds, no standing for more than one hour at a time or for more than five hours per eight hour day, and no sitting for more than two hours at a time or for more than six hours per eight hour day (*id*.).

On February 26, 2013, Plaintiff reported he was still having a lot of back pain (tr. 468). Dr. VerVoort added a prescription of Amrix for Plaintiff to take in combination with the Avinza. Dr. VerVoort noted that while Plaintiff still had pain which interfered with his functioning, he acknowledged that the Avinza "reduces the overall level of pain and improves his function and quality of life" (*id*.). On June 25,

2013, Plaintiff reported to Dr. VerVoort that he was taking the morphine sulfate one to three times a day for breakthrough pain (tr. 465). Because it had been nine months since his last right lumbar facet RFA injection procedure, Dr. VerVoort referred Plaintiff back to Dr. Stein for that purpose. Plaintiff subsequently received injections in a two-stage approach at Dr. Stein's office on August 1 and 15, 2013 (tr. 478–83).

Plaintiff then returned to Dr. VerVoort on September 17, 2013, and reported that the injections did not help his back pain at all (tr. 463). On examination, Dr. VerVoort noted that Plaintiff could heel and toe walk without weakness, that he experienced the most back pain with lumbar extension, and that there was no radiating leg pain but there were episodes of numbness and tingling in his thighs and calves, which came and went primarily when he walked (*id*.). Dr. VerVoort commented that these were probably referred symptoms, and he instructed Plaintiff to contact him if he developed any permanent numbness or weakness in his legs (*id*.).

On October 15, 2013, Plaintiff again reported intermittent paresthesias of the right leg that generally developed when he was upright and walking for a block (tr. 462). Plaintiff reported that he walks for exercise but can only walk about a block before the paresthesias and back pain interfere (*id*.). Dr. VerVoort gave Plaintiff a prescription for a YMCA membership so that he could participate in aquatic therapy,

which Dr. VerVoort said would help him build strength and endurance and facilitate weight loss (*id*.). Dr. VerVoort observed that overall Plaintiff was doing well and that he would see him again in three months (*id*.). During another follow-up visit on January 7, 2014, Plaintiff reported a lot of right leg pain and swelling (tr. 474). Dr. VerVoort could not attribute this to any nerve impingement in his back, nor to any treatment he had been provided (*id*.). Plaintiff also still showed "restricted lumbar range of motion with flexion associated with tightness in his back and extension causing some sharp, non-radiating low back pain" (*id*.). Dr. VerVoort increased Plaintiff dosage of morphine sulphate (*id*.). Plaintiff stated that the medicine reduces pain and improves function, and Dr. VerVoort said he would see Plaintiff again in three months (*id*.).

Plaintiff was also seen by David Smith, M.D., on December 9, 2013, for a primary care checkup. Dr. Smith referred Plaintiff to an orthopedist for treatment of his knee pain, which involved swelling, limited range of motion, and gait disturbance (tr. 486–88). Dr. Smith evaluated the severity as moderate (tr. 486). On a February 26, 2014, visit with Dr. Smith, Plaintiff again complained of swelling in his left knee, for which Dr. Smith prescribed Medrol (tr. 484–85).

On March 14, 2014, Plaintiff went to the emergency room at Baptist Hospital with complaints of swelling in his left knee. He was found to have swelling in the anterior left knee and mild pain with passive range of motion (tr. 491). Plaintiff was given medications and told to follow up with Elise Gordon, M.D. (tr. 505, 508).

Plaintiff followed up with Dr. Gordon on March 25, 2014. He reported that his symptoms began on March 1, 2014, and included pain, swelling, and loss of movement (tr. 532). Plaintiff described his symptoms as moderate or severe and worsening, and made worse by standing and walking (*id.*). Dr. Gordon's examination revealed a deceased range of motion secondary to pain with flexion reduced by thirty degrees, but she noted that Plaintiff was in not acute distress (tr. 532–33). Dr. Gordon diagnosed chronic pain and knee joint pain probably associated with osteoarthritis (tr. 533). Plaintiff was to follow up with a Dr. Kujaswski and to avoid running and jumping (*id.*).

B.    Personal History

Plaintiff testified at the hearing before the ALJ on March 27, 2014, as follows. Plaintiff stated he last worked during May of 2012 as a custodian (tr. 44). Plaintiff subsequently applied for a job as a custodian at a local hospital, but he was not hired due to his restrictions and limitations, and many of the other jobs he saw required training or certifications he did not have (tr. 44–45). Plaintiff stated he was not able

to perform work on a sustained basis because of his pain level and problems with standing for longer than twenty minutes—and for that reason he carries a cane (tr. 47–48).

As far as a daily routine (at or about the time of Plaintiff's hearing), Plaintiff stated that typically in the morning he, along with his mother's help, gets his youngest child ready for school (tr. 54–55). Plaintiff stated he then tries to wash clothes or the dishes, but within twenty to thirty minutes he hurts so bad he needs to sit down (tr. 55). Plaintiff also tries to take walks because he has been medically directed to exercise (*id.*). Plaintiff previously did aerobic water exercise at the YMCA swimming pool, and while it seemed like it was helping his back, he had to quit after a month when his knee problems commenced (tr. 56–57). In the afternoon, Plaintiff helps his children with their homework, and in the evenings he performs activities such as tidying his room or folding clothes or helping with the cooking (tr. 58). Plaintiff stated that he no longer attended church because he could not sit more than twenty or thirty minutes at a time (tr. 59). About once per month, Plaintiff makes a trip to the grocery store (tr. 59–60). Plaintiff stated he can lift a gallon of milk, but with anything over fifteen to twenty pounds, he "start[s] feeling it" (tr. 63). Plaintiff said that he can not bend or crawl and that driving is difficult when he is taking all his medications, such as morphine and muscle relaxers (tr. 63–64). When asked if he

felt he was able to return to work, Plaintiff responded that he was, but with limitations

(tr. 44).

V.      DISCUSSION

1.      Plaintiff first contends the ALJ erred by failing to reasonably address or

resolve a conflict between the testimony of the VE and applicable listings of the

DOT, as required by Social Security Ruling ("SSR") 00-4p, before relying on the

VE's testimony.

In determining that there were significant numbers of available jobs in the

national economy that the claimant could perform, the ALJ cited to the VE's

testimony that one with Plaintiff's RFC could perform the jobs of Surveillance

System Monitor, Order Clerk, Assembler Inspector, and Assembler of Small Products

(tr. 30–31, 71). Plaintiff asserts that a conflict between the DOT and the VE's

testimony arose because, while the VE identified the occupations of Assembler

Inspector and Assembler of Small Products as being sedentary jobs, they were

actually listed in the DOT as light duty jobs, and while the VE identified the job of

Order Clerk as having a Specific Vocational Preparation (SVP) rating level of 2, the

DOT provided that it was 4.[5]

---

[5] "Specific Vocational Preparation is defined as the amount of lapsed time required by a
typical worker to learn the techniques, acquire the information, and develop the facility needed for

During the hearing, the ALJ asked the VE the following questions:

Q:    Okay. Is all of your testimony consistent with the Dictionary of Occupational Titles?
A:    Yes, ma'am.
Q:    And with respect to the sit/stand option and the, the lifting of the, you know, the light jobs, on what did you base those opinions?
A:    I've been this [sic] for 30 years, Your Honor. I've seen most of these jobs.
Q:    Okay. Thank you.
A:    Professional experience.

(tr. 72).

Based upon the first question quoted above, Plaintiff contends that the VE's representation was faulty, and it led to the ALJ's erroneous reliance upon it in her decision. Defendant, on the other hand, argues that the VE's answer to the second question above, indicating for at least one aspect of his analysis—his evaluation of Plaintiff's sitting and standing capabilities—that he drew upon his professional experience, somehow signaled to the ALJ that his testimony was in fact different from what was listed in the DOT. The court, however, does not find that the VE's statement about his experience should be read to modify or override the VE's *immediately preceding* statement that *all* of his testimony was consistent with the

---

average performance in a specific job-worker situation." *See* http://www.occupationalinfo.org /appendxc_1.html (accessed on August 1, 2017). The higher the rating number is, the more preparation time is needed for the job.

DOT.  Certainly both statements taken together *can* be true, that the VE's conclusions

were consistent with the DOT *and* were based on his experience.  After all, the reason

the first question is one that is routinely asked of VE's is in order for an ALJ to learn

where any conflicts exist, and the VE's answer in that regard should be taken at face

value absent clear evidence to the contrary.

Defendant additionally asserts that the ALJ atoned for the VE's mistake by

making the following statement in her decision:

> Pursuant to SSR 00-4p, the undersigned asked the vocational expert if
> his testimony is consistent with the information contained in the
> Dictionary of Occupational Titles.  Although the vocational expert's
> testimony regarding some of the limitations in the residual functional
> capacity *is not specifically addressed* by the Dictionary of Occupational
> Titles, he  testified that he based his opinions about those limitations on
> his 30 years of professional experience and his observation of these jobs.

(tr. 31) (emphasis supplied).  However, it is difficult to tell whether the ALJ's

statement reflects an attempt to account for any inconsistency or irregularity in the

VE's representation that his testimony was consistent with the DOT.  In any event,

it is clear that the VE, whether prompted by the ALJ or not, did not reconcile or

explain on the record where or how his findings departed from what was in the DOT.[6]

---

[6] *See* SSR 00-4P (S.S.A.), 2000 WL 1898704 at *2 ("Occupational evidence provided by a VE or VS generally should be consistent with the occupational information supplied by the DOT. When there is an apparent unresolved conflict between VE or VS evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE or VS evidence to support a determination or decision about whether the claimant is disabled.  At the

The conflict is of no moment, however. As the parties recognize, the VE's testimony conflicted with the DOT as it concerns the occupations of Assembler Inspector, Assembler of Small Products, and Order Clerk,[7] but the VE also testified that Plaintiff could perform in the position of Surveillance System Monitor, for which the VE found approximately 900,000 available jobs in the national economy, 45,000 jobs in the regional economy, and 4,000 in the state economy (tr. 30, 71). The ALJ also referred to the VE's testimony, in response to a further hypothetical, regarding four other jobs, Information Clerk, Parking Lot Attendant, Mail Sorter, and House Sitter, which would be appropriate for Plaintiff despite being classified as light work because they did not require any lifting beyond what was described in the RFC (tr. 31, 69–70).

Thus, even if the VE's stated inconsistencies with the DOT amounted to error, the error would be harmless because there was sufficient evidence of other jobs in significant number that Plaintiff could perform. *See* <u>Thomas v. Comm'r of Social Sec.</u>, 497 F. App'x 916, 920 (11th Cr. 2012) (finding harmless error where, despite

---

hearings level, as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such consistency.").

[7] It should be noted that Defendant argues that the VE's misstatement that the Order Clerk position held a SVP of 2 when the DOT listed it at 4 was inconsequential because the ALJ's RFC finding did not include any SVP limitations.

VE's faulty testimony with regard to two available positions that were beyond the claimant's educational level, the VE testified as to two other jobs the claimant could perform with at least 115,000 positions available nationally and 1,300 available in Florida); Johnson v. Comm'r of Social Security, 2014 WL 12623026, 2014 WL 12623026, at *5 (M.D. Fla. Sep. 9, 2014) (VE's error with regard to one available job found non-prejudicial because VE testified as to two other positions with sufficient available jobs); Williams v. Astrue, No. 2:08–cv–477–FtM–29SPC, 2009 WL 2045339, at *3 (M.D. Fla. July 8, 2009) (VE's testimony as to position with 100,000 jobs available nationwide, 6,000 available statewide, and 200 locally, held sufficient despite conflicts in the VE's testimony regarding other available jobs); *see also* Gould v. Colvin, No. 16–004S, 2017 WL 979026, at *6 (D.R.I. Jan. 25, 2017) (collecting cases). As compared with these cited cases, the numbers of Surveillance System Monitor positions available for Plaintiff in the instant case are clearly ample enough to render any error by the VE harmless.

2.      Plaintiff next asserts that the ALJ's findings concerning the intensity, persistence and limiting effects of his symptoms—chiefly, pain—and discounting them as "not entirely credible," were in error. The ALJ thoroughly reviewed the medical record in this case, and although Plaintiff recounts much of the same medical records, pointing out instances where Plaintiff complained about debilitating pain

during his medical visits, this effort does not countermand the fact that the ALJ's conclusions are firmly supported by substantial evidence in the record.

A claimant may establish that he has a disability through his own testimony regarding his pain or other subjective symptoms. Dyer v. Barnhart, 395 F.3d 1206, 1210 (11th Cir. 2005) (per curiam). In such a case, the claimant must show: (1) evidence of an underlying medical condition, and either (a) objective medical evidence that confirms the severity of the alleged pain arising from that condition, or (b) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain. *Id.*

If, as here, the ALJ determines under the latter prong of the standard that the claimant has a medically determinable impairment that could reasonably be expected to produce the pain, she must then evaluate the extent to which the intensity and persistence of the pain limits the claimant's ability to work. 20 C.F.R. § 404.1529(b). The ALJ may consider the claimant's history, the medical signs and laboratory findings, the claimant's statements, statements by treating and non-treating physicians, and other evidence relating to how the pain affects the claimant's daily activities and ability to work. § 404.1529(c). "While both the Regulations and the Hand [v. Bowen, 793 F.2d 275, 276 (11th Cir. 1986)] standard require objective medical evidence of a condition that could reasonably be expected to cause the pain

alleged, neither requires objective proof of the pain itself." Elam, 921 F.2d at 1215. "[P]ain alone can be disabling, even when its existence is unsupported by objective evidence." Foote v. Chater, 67 F.3d 1553, 1561 (11th Cir. 1995) (citations omitted). The presence or absence of evidence to support symptoms of the severity claimed, however, is a factor to be considered. Marbury v. Sullivan, 957 F.2d 837, 839–40 (11th Cir. 1992); Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983). When evidence of pain derives from the subjective testimony of the claimant or other personal witnesses, "and a credibility determination is, therefore, a critical factor in the Secretary's decision, the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding." Tieniber, 720 F.2d at 1255.

Here, the ALJ found that Plaintiff's impairments could reasonably be expected to cause some of his pain and other symptoms, but she found Plaintiff not to be entirely credible as far as the intensity, persistence, and limiting effects of his symptoms (tr. 18). In finding that Plaintiff had the RFC to perform a range of sedentary work, the ALJ noted that on multiple occasions in the record, Plaintiff's treating physicians uniformly stated that he could return to work (tr. 29). The ALJ placed significant weight on the opinion of Dr. VerVoort, and while Dr. VerVoort placed certain limitations on sitting, standing, walking, bending, and lifting, the ALJ

accommodated for these limitations in her RFC assessment (tr. 26, 29). The ALJ also noted that Dr. Behrens' opinions, that Plaintiff could return to work with similar limitations, were also consistent with her RFC assessment—although, as the ALJ recognized, Dr. Behren's opinions were given prior to the alleged onset date. The ALJ also remarked upon the fact that, after seeing Plaintiff for his knee problem, Dr. Gordon's only restriction was for Plaintiff to avoid running and jumping (tr. 29). Additionally, the ALJ's limitations included accommodations, such as allowing for deficits in concentration, persistence and pace, in recognition of the fact that Plaintiff's use of potent medications might cause side effects (tr. 26).

Moreover, the ALJ discussed the fact that, as Plaintiff testified, in applying for unemployment compensation benefits, Plaintiff certified that was ready and able to become employed (tr. 26). Indeed, when asked directly by the ALJ whether he felt able to return to work, Plaintiff replied that he was, "with limitations" (*id*.). Finally, although the ALJ noted that Plaintiff's obesity was a longstanding problem that preceded his onset date, the ALJ accounted for the fact that obesity might compound his difficulties (tr. 28).

In sum, the court finds that the ALJ considered Plaintiff's testimony regarding his pain and properly discounted it as inconsistent with the medical and other evidence in the record which consistently reflected Plaintiff's ability to work within

the confines of the limitations the ALJ identified. Thus, the ALJ's decision with regard to Plaintiff's credibility was supported by ample substantive evidence.

## VI.    CONCLUSION

For the foregoing reasons, the Commissioner's decision is supported by substantial evidence and should not be disturbed. 42 U.S.C. § 405(g); Lewis, 125 F. 3d at 1439; Foote, 67 F.3d at1560. Furthermore, Plaintiff has failed to show that the ALJ applied improper legal standards, erred in making her findings, or that any other ground for reversal exists.

Accordingly, it is **ORDERED** that:

1.    Nancy A. Berryhill is substituted for Carolyn W. Colvin as Defendant in this action.

2.    The decision of the Commissioner is **AFFIRMED**, this action is **DISMISSED,** and the clerk is directed to close the file.

At Pensacola, Florida this 11th day of August 2017.

/s/ Elizabeth M. Timothy
**ELIZABETH M. TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**